NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____

JOYCE A. JONES,                          :
                                         :
            Plaintiff,                   :            Civil No. 10-1544 (RBK)
                                         :
      v.                                 :            **OPINION**
                                         :
MICHAEL J. ASTRUE, Commissioner of       :
Social Security,                         :
                                         :
            Defendant.                   :
_____         :

**KUGLER**, United States District Judge:

        This is an appeal from a decision by the Commissioner of Social Security denying

Plaintiff Disability Insurance Benefits ("DBI") and Supplemental Security Income payments

("SSI").  Plaintiff claims that she is entitled to DBI and SSI because she is unable to work.  After

a hearing, the Administrative Law Judge ("ALJ") determined that Plaintiff was not disabled

within the meaning of the Social Security Act, 42 U.S.C. § 401 et seq. (the "Act"), because she is

able to perform past relevant work.  Plaintiff now appeals that decision to this Court.  Because

the ALJ's decision was based on substantial evidence on the record, the Court upholds the ALJ's

decision.

**I.      BACKGROUND**

        Prior to November 2005, Plaintiff worked for six months as a "parts cleaner" at a facility

that made compact discs.  (R. 35-36).  The job required Plaintiff to move 55 pound barrels of

nitric acid with a hand cart and clean certain machine parts with the nitric acid.  (Id.).  On

November 5, 2005, Plaintiff was injured on the job.  (R. 36).  She returned to work briefly after

1

her injury, but she was unable to continue work because of her injury.  (R. 36-37).  She now claims that she has been completely disabled since November 13, 2005 because she suffers from obesity, depression, hypertension, diabetes, carpal tunnel syndrome, and cervical radiculopathy.

### A.  Procedural History

In January 2007, Plaintiff applied for DBI and SSI.  (R. 114-25).  She alleged that she was unable to work beginning November 13, 2005 because of diabetes, a back injury, and high blood pressure.  (Id.).  The Social Security Administration (the "Administration") denied Plaintiff's claims.  (R. 71-82, 88-90).  Upon request, the Administration granted Plaintiff a hearing regarding her application.  (R. 93-94, 97-98).  Administrative Law Judge Daniel N. Shellhamer presided over the hearing.  After the hearing, the ALJ issued a decision denying Plaintiff's DBI and SSI.  (R. 8-28).  Plaintiff filed a Request for Review of the ALJ's decision with the Appeals Council.  (R. 6-7).  The Appeals Council denied Plaintiff's request.  (R. 1-5).  In March 2007, Plaintiff timely filed the Complaint in this matter challenging the Commissioner's denial of her application for DBI and SSI.

### B.  Plaintiff's Testimony before the ALJ

Plaintiff was born in 1961.  (R. 180-81).  She has a high school graduate equivalence diploma.  (R. 142).  Beginning in approximately 1999, Plaintiff worked for Sony as a "replication operator," which involves operating a machine that makes compact discs.  (R. 39).  The "physical demands" on a "replication operator" were "minimal" and required only "light lifting (5-10 lbs)."  (R. 238-39).  Sometime in 2005, Plaintiff began to work as a "parts cleaner" for Sony.  (35, 39).  That job required Plaintiff to place 55-pound barrels of nitric acid on hand carts and move them across the building.  (R. 35-36).  Plaintiff would then clean a machine part called a "mast."  (Id.).  She worked as a parts cleaner for approximately six months.  (R. 35, 39).

As a parts cleaner, Plaintiff worked twelve-hour shifts.  (R. 36).  She spent most of that time "on her feet."  (R. 36).

Plaintiff injured her right knee and leg on November 5, 2005 while working for Sony. (R. 36).  Plaintiff testified that she felt suddenly limp while moving a barrel of nitric acid, and that she was unable to get out of her car when she got home that evening.  (R. 45-46).  Because of extreme pain, Plaintiff went to the emergency room where she received Percocet so she could undergo testing.  After undergoing magnetic resonance imaging ("MRI") and computerized axial tomography ("CAT") scans, doctors diagnosed her with a back problem.  (R. 46).  She received three epidural injections in two-week intervals.  (R. 46-47).  Plaintiff does not believe that the epidural injections helped with her back problem.  (R. 47).  Plaintiff also testified that during this period she began to experience loss of bladder control and claims that doctors told her that this was due to too many steroids delivered by the epidural injections.  (R. 47).  Plaintiff has diabetes, and she testified that it has "worsened" since her injury at Sony.  (R. 47).  She also claims that "facet blocks" administered to help with her back pain caused her "sugar to rise."  (R. 47).

She tried to return to work after the injury at Sony, but was unable to do so.  (R. 46, 137). She stopped working on November 13, 2005, and collected worker's compensation benefits.  (R. 137).  She has not worked since November 13, 2005.  (R. 137).  Plaintiff's injury at Sony is the subject of a worker's compensation claim, but she does not currently receive any treatment or cash benefits from the worker's compensation carrier.  (R. 45).  Plaintiff does not have health insurance and is not currently receiving any treatment for her conditions.  (R. 45).

Before joining Sony, Plaintiff worked for Wal-Mart as a cashier for a period during 1994. (R. 37-38, 40).  From 1989 until 1993, Plaintiff worked on the assembly crew at Struthers-Dunn setting the timing in relays.  This was desk assembly work, but it also required Plaintiff to walk

around the plant and pick items off the floor.  (R. 40, 43-44).  In 1990, Plaintiff worked briefly supervising a janitorial service for Martin Car Lot.  (R. 41).  Plaintiff testified that her job at Struthers-Dunn was the least physically demanding job she ever held, and that she could not perform that job in her current condition due to back pain.  (R. 58-59).

Plaintiff testified that her back "bothers" her "24/7."  (R. 49).  She also testified that she experiences constant neck pain, which runs down the middle of her back and across her lower back.  (R. 49).  Plaintiff also experiences pain in her buttocks and down to her feet.  (R. 49).  The pain increases if she stands too long and can become so painful that it "will drop you to the floor."  (R. 49).  If Plaintiff sits too long, she experiences pain in her back, shoulders, and neck. (R. 50).  She testified that she must alternate between standing and sitting every ten to fifteen minutes because of the pain.  (R. 49-50, 53-54).

Sometime before her injury at Sony, Plaintiff had surgery on both of her hands for bilateral carpal tunnel syndrome.  (R. 50).  Plaintiff believes that her right hand improved a little after the surgery but that her left hand did not improve at all.  (R. 51).  She claims that she "can't lift anything."  (R. 51).  If she lifts something "as little as a package of ground beef," she experiences pain in her fingers and "all the way up [her] harm."   (R. 51).  The pain radiates up to her chest.  (R. 51).  Plaintiff testified that when she returned to work after surgery on her left hand, she cried because of the pain.  According to Plaintiff, she was preparing for a second surgery on her left hand when she was injured at Sony.  (R. 52-53).

Plaintiff sleeps only four to five hours per night because of pain.  (R. 53).  Sometimes she just lies in bed unable to sleep because of pain.  (R. 53).  Plaintiff testified that she is largely unable to care for her personal needs.  She can drive only short distances because of her back pain and bladder condition.  (R. 56).  She has to take showers because she cannot climb in and

4

out of a bathtub.  (R. 57).  She can no longer take care of her hair, and she is unable to do extensive shopping for groceries.  (R. 55).  She is 5'4'' tall and weighs approximately 230 pounds.  (R. 60-61).  Her "normal" weight before her injury at Sony was around 187 pounds.  (R. 61).

### C.  Medical Evidence

In 2003, over two years before the onset of Plaintiff's alleged disability, Dr. Elliot Ames performed right carpal tunnel release surgery on Plaintiff.  (R. 336).  According to Dr. Ames, the surgery produced good results.  (R. 319, 329-32).  Dr. Ames performed tunnel decompression on Plaintiff's left hand in August 2004, and, according to Dr. Ames, Plaintiff recovered well.  (R. 314, 316, 317).  On November 17, 2004, although Plaintiff reported some numbness in a cold environment at work, Dr. Ames's clinical evaluation of Plaintiff's left hand showed no scar tenderness and Plaintiff had full range of motion.  (R. 313).  Dr. Ames discharged Plaintiff .  (R. 313).

Plaintiff continued to work until November 2005, when she visited the Emergency Department of Kennedy Memorial Hospital following her injury at Sony.  (R. 279-312).  X-rays and a venous Doppler test of Plaintiff's pelvis and right femur were "unremarkable" and revealed "no evidence of fracture, dislocation or bony destructive process."  (R. 310-11).  On December 7, 2005, Dr. Michael H. Bojarski, of American WorkCare, examined Plaintiff regarding her injury.  (R. 302-09).  During the examination, Plaintiff walked and changed positions with a "mild degree of difficulty," but her "lumbar flexion" was within "functional limits."  (R. 302).  Dr. Bojarski noted "mild generalized muscle spasm" and "some discomfort in right groin region."  (R. 302).  Ultimately, however, Dr. Bojarski concluded that "the examination is suggestive of a right groin strain and sprain with the possibility of right-sided lumbar radicular

pain." (R. 303). Dr. Bojarski found that Plaintiff "may continue working in a light duty, sit

down job." (R. 303). He recommended that Plaintiff receive physical therapy and he prescribed

medication. (R. 303).

Dr. Bojarski reexamined Plaintiff on December 9, 2005. (R. 298). Plaintiff reported "no

change in her symptoms," and Dr. Bojarski found that the physical examination "remain[ed]

unchanged." (R. 299). Dr. Bojarski also found that Plaintiff remained available for a "light

duty, sit down job." (R. 303). Dr. Bojarski examined Plaintiff on December 21, 2005 (R. 294-

96), December 27, 2005 (R. 289-93), January 9, 2006 (R. 284-88), January 10, 2006 (R. 276-78),

January 17, 2006 (R. 272-75), and January 31, 2006 (R. 268-70). After each visit, he reported

that Plaintiff was able to perform a light-duty job.

On March 14, 2006, Dr. Bojarski met with Plaintiff to discuss the results of an MRI of

her lumbar spine. (R. 258). The MRI showed "a mild right sided herniation at the level of L4-5

encroaching the right neuroforamin and a large left-sided disc herniation . . . at L5-S1 with

impingement of the S-1 nerve root." (R. 259). Dr. Bojarski discussed treatment options with

Plaintiff. Plaintiff preferred 'to resume physical therapy and continue medications" rather than

pursue "epidural/neuroforaminal steroid injections." (R. 259). Dr. Bojarski again found that

Plaintiff was able to do a light-duty, sit down job. (R. 259). Dr. Bojarski examined Plaintiff five

times during April and May 2006. After all five examinations, Dr. Bojarski found that Plaintiff

could perform a light-duty, sit down job. (R. 214, 224, 227, 241, 247). On May 4, 2006, Dr.

Bojarski reviewed an electromyogram and nerve conduction study of Plaintiff's right leg. (R.

213). Those tests showed "an acute L4-L5 and L5 radiculopathy." (R. 213). In November

2006, Dr. Bojarski responded to a request for information by stating that Plaintiff had achieved

"maximum medical improvement." (R. 211).

In June 2006, Dr. Adam Sackstein of the Pain Management Center examined Plaintiff. Plaintiff complained of lower back pain and neck pain radiating to her fingers.  (R. 427). Plaintiff told Dr. Sackstein that she was independent in her daily living.  (R. 428).  Dr. Sackstein recommended and administered epidural steroid injections in June, July, and August 2006.  (R. 420-26).  Plaintiff reported temporary relief from the steroids.  (R. 420).  In October 2006, Plaintiff received lumbar facet injections.  (R. 417-18).  She reported some relief in November 2006.  (R. 416).  Dr. Sackstein administered another facet injection, and Plaintiff reported ten percent relief.  (R. 414).

In October 2006, Dr. Joan F. O'Shea, a neurologist, examined Plaintiff.  (R. 432-35). Plaintiff complained of back and neck pain.  (R. 433).  Dr. O'Shea noted that Plaintiff was obese. (R. 433).  Dr. O'Shea also noted that Plaintiff was hyperreflexic, and that there was no swelling in Plaintiff's arms or legs.  (R. 434).  Plaintiff's range of motion in her wrists, hips, and knees was normal, but she had decreased cervical range of motion.  (R. 434).  Flexion/extension of Plaintiff's lumbosacral spine was normal.  (R. 434).  Dr. O'Shea performed the "straight leg raising test," which was positive, but Plaintiff's musculoskeletal examination was otherwise normal.  (R. 434).  Dr. O'Shea reviewed prior doctors' reports of Plaintiff's MRIs but did not review the actual films.  (R. 434).  Dr. O'Shea's conclusion was that Plaintiff had degenerative disc disease at L4-L5 and L5-S1 "by report."  She noted that Plaintiff's back pain was "constant."  (R. 434).  Dr. O'Shea concluded that Plaintiff could work "light duty with no lifting greater than 25 pounds."  (R. 435).  Dr. O'Shea reexamined Plaintiff in January 2007 and concluded that Plaintiff "is able to work light duty with frequent sitting and standing positions, every 30 minutes."  (R. 431).

In a one-page letter dated November 9, 2006, Dr. Robert Taffet, of D.R.S. Diagnostic Rehabilitation Specialist, states that Plaintiff was under his care and that she was "disabled." (R. 457). The letter does not describe Plaintiff's disability or physical condition. (R. 457).

In April 2007, Dr. Deogracias Bustos, a state agency nonexamining consultant reviewed Plaintiff's medical history and completed a "residual functional capacity assessment." (R. 436-43). Dr. Bustos noted that Plaintiff's primary diagnosis was degenerative disc disease and her secondary diagnosis was obesity. (R. 436). Dr. Bustos concluded that Plaintiff could lift or carry up to twenty pounds occasionally and up to ten pounds frequently. (R. 437). He also found that Plaintiff could sit for about six hours in an eight-hour day. (R. 437). He concluded that although Plaintiff needed to alternate between sitting and standing, she could do so during regular breaks. (R. 437). He also found that Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch and crawl and that she had no manipulative, visual, communicative, or environmental limitations. (R. 438-40). Dr. Bustos noted that Plaintiff was diabetic and hypertensive, but he found that there was no evidence of end-organ damage. (R. 438). Dr. Bustos disagreed with Dr. O'Shea's conclusion that Plaintiff needed to alternate between sitting and standing every thirty minutes. (R. 442). Dr. Bustos determined that Dr. O'Shea's conclusion was not supported by "objective findings." (R. 442).

On March 23, 2007, Dr. Ted Gallagher performed an EMG of Plaintiff's wrists. (R. 460). The EMG showed residual left median neuropathy at the level of the wrist and borderline residual right median neuropathy also at the level of the wrist. (R. 460-61). Dr. Gallagher found no evidence of ulnar neuropathy in either wrist, in her left forearm, or in her left elbow. (R. 461). Dr. Gallagher found that "[i]n general this is an overweight female with no acute distress." (R. 461). He also found that Plaintiff's "chief complaint is difficult to establish however [sic]

8

she does have residual median neuropathy at the left wrist,[and] [t]his degree of residual median neuropathy after CTR is usually acceptable and indeed is usually asymptomatic."  (R. 462).

In December 2007, Dr. George Knod, a consultative examiner for the New Jersey Department of Labor and Workforce Development, examined Plaintiff.  (R. 470).  Plaintiff complained of pain in her shoulders, mid-back, legs, buttocks, and the bottom of both feet.  (R. 471).  She also reported a history of hypertension and diabetes with no clear evidence of diabetic neuropathy.  (R. 472).  Plaintiff drove herself to the examination and reported that she was independent regarding basic hygiene and personal care.  (R. 471).  Dr. Knod observed that Plaintiff responded appropriately to all questions and was able to follow his commands.  (R. 472).  Plaintiff was able to walk without any assistance device and was able to walk a short distance on her toes.  (R. 474-75, 472).  She was also able to perform a partial squat with complaints of back pain and could ascend and descend from the examining table.  Except for neck flexion of forty-five out of fifty degrees and extension to fifty out of sixty degrees, Plaintiff's cervical spine was normal.  (R. 474).  A "Tinel's" test was positive across her left carpal tunnel, but negative on the right wrist.  (R. 472).

Dr. Knod concluded that Plaintiff had chronic pain symptoms in her lower back and legs, and across her mid-back, shoulders, and hands.  (R. 472).  He also found that there was prior EMG evidence of acute right L4 and L5 radiculopathy.  (R. 472).  Dr. Knod noted that Plaintiff was diagnosed with bilateral carpal tunnel syndrome with diminished grip strength.  (R. 472).  Although Plaintiff had diabetes, Dr. Knod found "no clear evidence of diabetic neuropathy.  (R. 472).

In October 2007, Dr. Kenneth C. Peacock conducted an "independent medical examination."  (R. 499-506).  Dr. Peacock found that Plaintiff's manual muscle testing and

reflexes were normal.  Plaintiff was able to walk on heels and toes and could stand up on tiptoes.

He also found that Plaintiff did not suffer from muscle spasms in her lumbar spine, and she did

not have any thoracic tenderness.  Dr. Peacock's overall impression was that Plaintiff had lumbar

spine disc herniation with radiculopathy.  (R. 504).  He found that Plaintiff had reached a

"plateau" and had reached "maximum medical improvement."  (R. 505).  According to Dr.

Peacock, Plaintiff had a "10% permanent partial disability with regard to the lumbar spine."  (R.

505).

In December 2007, Dr. Bruce Heppenstall, an orthopedic surgeon, examined Plaintiff.

(R. 480).  Plaintiff reported that her leg pain had gradually improved, but she claimed that she

still had significant lower back pain.  (R. 480).  Dr. Heppenstall noted that Plaintiff was "slightly

obese."  (R. 480).  Dr. Heppenstall also noted that Plaintiff had full range of motion in her

cervical spine.  (R. 480).  She had 70 degrees of flexion, full extension, and painful lateral

bending along her thoracolumbar spine.  (R. 480).  Dr. Heppenstall concluded from his review of

Plaintiff's March 10, 2006 MRI that Plaintiff had "a broad left paracentral L5-S1 disc herniation

with a mass effect on the exiting left S1 nerve root."  (R. 480).  Dr. Heppenstall also concluded

that Plaintiff had "a right far lateral interforaminal herniation that affects the right L4 nerve

root."  (R. 480).

On September 12, 2008, Plaintiff went to Kennedy Memorial Hospital and was diagnosed

with vasovagal syncope.  (R. 491).  Vasovagal syncope is the most common cause of fainting.  It

occurs when the body overreacts to triggers, such as the sight of blood or extreme emotional

distress.  The trigger causes a brief loss of consciousness caused by a sudden drop in heart rate

and blood pressure.  Vasovagal syncope is usually harmless and requires no treatment.  In

October 2008, Dr. Gregory Luma sent a one-paragraph letter stating that Plaintiff was under his

care for vasovagal syncope and that she was "unable to lift anything at this time."  (R. 493).  Dr.

Luma stated that he was unable to comment on any other restrictions because he had "not

evaluated Plaintiff" for other activities.  (R. 493).

In November 2008, Dr. Peacock reviewed records from Dr. Heppenstall, Dr. O'Shea, and

the MRI scan from April 2008.  (R. 495-96).  He stated that he had examined Plaintiff in

February and October 2007 and that the additional records did not change his diagnostic

impression or his opinion that Plaintiff did not need additional treatment.  (R. 496).

## II.    STANDARD OF REVIEW

A district court reviews a final decision by the Commissioner only to determine whether

the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir.

1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "'more than a mere scintilla.  It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422,

427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence,

the Court may not set aside the decision, even if the Court "would have decided the factual

inquiry differently."  Fargnoli v. Halter, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181

F.3d at 360).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of

substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing

formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for

substantial evidence is thus a qualitative exercise without which our review of social security

disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must

set aside the Commissioner's decision if the Commissioner did not take into account the entire

record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277,

284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has

sufficiently explained the weight he has given to obviously probative exhibits, to say that his

decision is supported by substantial evidence approaches an abdication of the court's duty to

scrutinize the record as a whole to determine whether the conclusions reached are rational.")

(quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not

substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to

resolve, a conflict created by countervailing evidence."  Wallace v. Sec'y of Health & Human

Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.    DISCUSSION

        To qualify for DBI, a claimant must meet the insured requirements of the Social Security

Act.  An impairment cannot be the basis for a determination of disability when the impairment

arose or reached disabling status after the date last insured.  See De Nafo v. Finch, 436 F.2d 737,

739 (3d Cir. 1971).  The determination of disability before the date last insured must be

demonstrated through medical evidence.  Id.; see also Manzo v. Sullivan, 784 F. Supp. 1152,

1156-57 (D.N.J. 1991).  The ALJ determined that Plaintiff satisfies the insurance requirement for

DBI.  (R. 11).  The parties do not contest that finding.

        The Commissioner conducts a five-step inquiry to determine whether a claimant is

disabled for purposes of both DBI and SSI.  See 20 C.F.R. § 404.1520 (DBI); 20 C.F.R. §

416.920 (SSI); see also Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner

first evaluates whether the claimant is currently engaged in a "substantial gainful activity."  Such

activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a)(4)(i) (DBI); 20 C.F.R. §

416.920(a)(4)(i) (SSI).  The Commissioner then ascertains whether the claimant is suffering from

a severe impairment, meaning "any impairment or combination of impairments which

significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (DBI); 20 C.F.R. § 416.920(c) (SSI).  If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a Listed Impairment.  20 C.F.R. § 404.1520(d) (DBI); 20 C.F.R. § 416.920(d) (SSI).  If the condition is equivalent to a Listed Impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC"), and analyze whether the RFC would enable the claimant to return to her "past relevant work."  20 C.F.R. § 404.1520(e) (DBI); 20 C.F.R. § 416.920(e) (SSI).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

### A.  The ALJ's Decision and Plaintiff's Arguments on Appeal

The ALJ upheld the determination that Plaintiff was not entitled to receive DBI or SSI. (R. 11-12).  The ALJ found that Plaintiff satisfied the first step in the sequential analysis because she had not engaged in any substantial gainful activity since the onset of her alleged disability on November 13, 2005.  (R. 12).  The ALJ found that prior to the alleged disability Plaintiff worked as a retail cashier and a replication operator.  (R. 12).  Plaintiff does not challenge the ALJ's determinations regarding step one.

Regarding step two, the ALJ found that Plaintiff had two severe impairments:  (1) lumbar degenerative disc disease with disc herniation at L4-L5; and (2) diabetes mellitus.  The ALJ rejected Plaintiff's claim that she is severely impaired because of high blood pressure, carpal tunnel syndrome, cervical radiculopathy, or obesity.  (R. 13).  Plaintiff also asserts, for the first

time, that she suffers from severe depression.  Plaintiff claims that record conclusively establishes that she is severely impaired because she suffers from all seven of those conditions.

Regarding step three, the ALJ found that Plaintiff does not have an impairment equivalent to the criteria of any of the Listed impairments described in Appendix 1 of the relevant regulations.  See 20 C.F.R., Part 404, Subpart P, App. 1; 20 C.F.R. § 416, Subpart I, App. 1.  The ALJ specifically analyzed whether Plaintiff's condition qualified under Listing 1.04, which involves disorders of the spine, and Listing 9.08, which involves diabetes mellitus. Plaintiff does not specifically challenge the ALJ's determination regarding step three.[1]

Regarding step four, the ALJ conducted a lengthy analysis of Plaintiff's RFC.  The ALJ concluded that Plaintiff retained the ability to "perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds."  (R. 18).   Plaintiff claims that the ALJ did not properly analyze Plaintiff's RFC because the ALJ did not perform a function-by-function analysis as required by the relevant regulations.  Plaintiff also argues that the regulations require an ALJ to consider both severe and non-severe impairments when determining a claimant's RFC.

Regarding the fifth step, the ALJ concluded that Plaintiff's RFC permitted her to perform past relevant work.  Specifically, the ALJ found that Plaintiff's prior work as a retail cashier and replications operator qualified as substantial gainful activity and that Plaintiff was able to perform both jobs.  (R. 26).  Thus, the ALJ concluded that under the sequential analysis established by the Administration, Plaintiff was not "disabled" as defined by the Act.

Plaintiff argues that the ALJ improperly dismissed her testimony regarding her pain and physical limitations in determining whether she was disabled.  Plaintiff also argues that the ALJ

[1] If the ALJ erred in determining that Plaintiff was not severely disabled because of other conditions such as obesity and high blood pressure, the ALJ could have considered other Listed impairments under step three.  However, Plaintiff does not identify any particular Listed impairments that she believes the ALJ should have considered.

14

did not properly evaluate the medical evidence.  Specifically, Plaintiff claims that the ALJ did

not adequately consider the conclusions of four treating physicians:  Drs. Heppenstall, O'Shea,

Taffet, and Luma.  Finally, Plaintiff argues that the record is sufficient for the Court to vacate the

ALJ's decision and enter summary judgment awarding Plaintiff DBI and SSI without remanding

the matter back to the ALJ.

### B.  Whether There is Substantial Evidence to Support the ALJ's Conclusions Regarding Plaintiff's Impairments (Step Two)

As mentioned above, at step two of the five-step sequential inquiry the ALJ determines

whether the claimant has a medically severe impairment or combination of impairments.  See

Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987); Social Security Ruling ("SSR") 86-8, 1986

SSR LEXIS 15, at *6-7; SSR 85-28, 1985 SSR LEXIS 19, at *1.  The Social Security

Regulations and Rulings,[2] as well as case law applying them, discuss the step-two severity

determination in terms of what is "not severe."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir.

1996).  According to the regulations, "an impairment is not severe if it does not significantly

limit [the claimant's] physical ability to do basic work activities."  Id. (quoting 20 C.F.R. §

404.1520(c), 20 C.F.R. § 404.1521(a)).  Basic work activities are "abilities and aptitudes

necessary to do most jobs," including, for example:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;

---

[2] Social Security Rulings constitute the SSA's interpretations of the statute it administers and of its own regulations. Chavez v. Dep't of Health & Human Servs., 103 F.3d 849, 851 (9th Cir. 1996).  Social Security Rulings do not have the force of law.  Id.  Nevertheless, once published, they are binding on all components of the Administration. Walton v. Halter, 243 F.3d 703, 708 (3d Cir. 2001).

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); 20 C.F.R. § 416.921(b).

The step-two inquiry is a de minimis screening device that disposes of groundless claims. See Smolen, 80 F.3d at 1290; McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986).  An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have "no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 SSR LEXIS 19, at *6-7.  Only those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits at step two.  See Bowen, 482 U.S. at 158 (O'Connor, J., concurring).  If the evidence presented by the claimant presents more than a "slight abnormality," the step-two requirement of "severe" is met, and the sequential evaluation process should continue.  See Smolen, 80 F.3d at 1290.  Reasonable doubts regarding severity are to be resolved in favor of the claimant.[3]

Here, the ALJ found that Plaintiff suffered from two severe impairments but rejected Plaintiff's claim that she was severely impaired because of hypertension, carpal tunnel syndrome, cervical radiculopathy, or obesity.  (R. 13).  The ALJ did not consider whether Plaintiff is severely impaired on account of depression because Plaintiff did not raise that condition before the ALJ.  Plaintiff argues that the ALJ erred because she is severely impaired on

---

[3] SSR 85-28, 1985 SSR LEXIS 19, at *11-12, states:

> [G]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.  Rather, it should be continued.

16

account of depression, obesity, hypertension, carpal tunnel syndrome, and cervical radiculopathy.  (Pl.'s Br. at 11).

The Court finds that the ALJ's characterization of Plaintiff's impairments is supported by substantial evidence.  First, the core of Plaintiff's challenge regarding the ALJ's analysis in step two is that the ALJ did not consider Plaintiff's many alleged conditions during the remainder of its analysis.  Plaintiff argues that the ALJ used step two to "eliminate from consideration significant conditions which limit Plaintiff's ability to function competitively in the work force." (Pl.'s Br. at 11).  That is incorrect.  Although the ALJ determined that Plaintiff's alleged hypertension, carpal tunnel, obesity, and cervical radiculopathy do not rise to the level of "severe impairment," the ALJ nevertheless considered each of those conditions when analyzing Plaintiff's RFC.  The ALJ did not limit his inquiry solely to Plaintiff's diabetes and lumbar degenerative disc disease.  Rather, he considered whether the evidence as a whole supported Plaintiff's claim that she was unable perform past relevant work.  Thus, Plaintiff's argument that the ALJ improperly used the second step to exclude evidence of Plaintiff's other conditions is misguided.

Second, there is substantial evidence to support the ALJ's conclusion that Plaintiff's only severe impairments are diabetes and lumbar degenerative disc disease.  Regarding carpal tunnel, Plaintiff argues that the ALJ's decision is unsupported because the ALJ failed to consider the diagnosis of Plaintiff's treating physician in 2007 (R. 485, 490), and because Dr. Knod found that Plaintiff continued to experience carpal tunnel symptoms even after the corrective surgeries. (Pl.'s Br. at 11).  That evidence does not undermine the ALJ's conclusion.  As noted by the ALJ, Plaintiff's post-operative clinical examination showed no scar tenderness, limited range of motion, or reduced grip strength.  (R. 313-319).  In October 2006, Dr. O'Shea examined Plaintiff

and found full range of motion and normal strength in Plaintiff's wrists.  (R. 432-35).
Additionally, in June 2006, Dr. Gallagher reviewed an EMG of Plaintiff's wrists and concluded
that although Plaintiff had "residual median neuropathies," her degree of median neuropathy is
usually acceptable and asymptomatic.  (R. 461-62).  Regarding Dr. Knod's findings, the ALJ
noted that although Dr. Knod found that Plaintiff was previously diagnosed with carpal tunnel
and residual wrist strength, Dr. Knod measured Plaintiff's wrist strength at four out of five
bilaterally (both pinch and grip strength).  The ALJ further observed that in April 2007, Dr.
Bustos found that Plaintiff did not have any manipulative limitations.  (R. 437).

        That evidence, which the ALJ thoroughly analyzed and discussed, amounts to substantial
evidence in support of the ALJ's conclusion.  Dr. Knod's evaluation does not support the
conclusion that Plaintiff's carpal tunnel was a severe impairment.  As the ALJ noted, Dr. Knod
found that Plaintiff had regular grip and pinch strength and no usual impairments as a result of
her wrists.  The overwhelming majority of doctors who evaluated Plaintiff following her
surgeries determined that Plaintiff did not experience any unusual residual symptoms.  The
assertion of Plaintiff's physician in 2007, (R. 485, 490), does not undermine the substantial
evidence supporting the ALJ's decision.  Plaintiff's physician simply asserts on two forms that
Plaintiff has "carpal tunnel syndrome" and includes the notation "wrist splint."  (R. 485, 490).
Plaintiff does not point to any statement by her physician explaining the actual effect of
Plaintiff's condition on her mobility.  Indeed, Plaintiff fails to mention in her brief that the record
also includes two forms from her treating physician from February and May 2008 that make no
mention of carpal tunnel syndrome.  (R. 481-82).  The ALJ properly concluded that there was
insufficient evidence to find that carpal tunnel syndrome severely impaired Plaintiff's ability to
do basic work.

Regarding hypertension, Plaintiff does not point to any evidence that the ALJ overlooked or that supports a finding that Plaintiff's hypertension amounts to a severe impairment. The ALJ noted that according to the <u>Merck Manual of Diagnosis and Therapy</u>, Table 199-2 (17th ed. 1999), a patient has mild to moderate hypertension if her blood pressure ranges from 140/90 to 179/109. (R. 13). Plaintiff's blood pressure is consistently below 140/90, and Plaintiff points to no evidence that her blood pressure affected her ability to do basic work. (R. 13). The ALJ concluded that Plaintiff's hypertension "does present a severe impairment to daily work activities provided [Plaintiff] is responsible in taking the prescribed medications and adhering to an appropriate diet." (R. 13). The ALJ's determination was proper.

Regarding Plaintiff's cervical radiculopathy, Plaintiff argues that the ALJ improperly disregarded the findings of Dr. O'Shea and Dr. Sackstein. (Pl's Br. at 11-12). Plaintiff argues that the ALJ should have given greater weight to Dr. O'Shea's conclusions because she is a neurosurgeon. However, Plaintiff overstates the substance of Dr. O'Shea's findings. In October 2007, Dr. O'Shea quoted from a report regarding a June 2006 MRI that Plaintiff had mild reversal of C7-T1, minimal disc bulge at C7-T1, and minimal disc bulge centrally at C3-C4 and C4-C5. (R. 434). Dr. O'Shea did not include those findings in her impressions and recommendations. (R. 434-35). More important, even after recounting the report of the June 2006 MRI, Dr. O'Shea found that Plaintiff could "work light duty with no lifting greater than 25 pounds." (R. 435). Thus, Dr. O'Shea's October 2006 report does not support the conclusion that Plaintiff suffered from a severe impairment as a result of cervical radiculopathy. Indeed, substantial evidence supports the ALJ's determination that Plaintiff's cervical radiculopathy did not result in a severe impairment. Plaintiff did not complain to Dr. Knod regarding neck pain when he evaluated her in December 2007, (R. 472), and Dr. Heppenstall's examination in

December 2007 revealed that Plaintiff's cervical spine had a full range of motion.  (R. 480).  The ALJ thoroughly discussed all of this evidence, including Dr. O'Shea's report, and his conclusion is supported by substantial evidence on the record.  (See R. 14).

Regarding Plaintiff's obesity, Plaintiff argues that the ALJ did not properly apply SSR 02-1p, 2002 SSR LEXIS 1, which addresses the evaluation of obesity in disability claims.  That Ruling explains that obesity is a medically determinable impairment and that adjudicators must consider its effects when evaluating disability.  Id. at *8-10.  The Ruling also instructs adjudicators to consider the combined effects of obesity with other impairments.  Id. at *11-12.  Thus, if a claimant is obese, the adjudicator must consider whether obesity aggravates any other impairments.  Plaintiff claims that the ALJ failed to conduct the required analysis by evaluating whether Plaintiff's obesity resulted in increased discomfort to Plaintiff or otherwise impaired her ability to conduct basic work.  Plaintiff notes that her height and weight place her within the range of individuals that SSR 02-1p categorizes as obese.  (Pl.'s Br. at 14).

Plaintiff's argument is misguided.  The record shows that Plaintiff weighed between 220 and 235 pounds and is five feet and four inches tall.  (R. 428, 430, 433, 217).  However, the ALJ determined that "the totality of the objective evidence illustrates that this condition does not produce more than minimal functional restrictions and therefore, is not a severe impairment." (R. 14).  Moreover, when the ALJ analyzed Plaintiff's RFC, he considered Plaintiff's overall mobility, strength and range of motion to determine her actual ability to perform basic work.  Thus, he relied on the doctors' overall assessments of Plaintiff's ability to perform basic chores and personal care as well as her overall pain level and mobility.  That analysis necessarily incorporated whether Plaintiff's weight limited her ability to perform basic work.  Plaintiff's claim that the ALJ did not adequately consider Plaintiff's weight is meritless.

Regarding Plaintiff's allegations of depression, the evidence does not support a finding of severe impairment based in whole or in part on any mental or emotional problems.  First, Plaintiff did not claim any mental or emotional impairments at the hearing.  (R. 59).  Thus, she cannot now argue that she satisfied her burden of proving an emotional or psychological impairment.  Second, even if Plaintiff had asserted depression as a severe or contributing impairment, the only mention of depression in the record are notations by Wenonah Medical Associates, Plaintiff's treating physicians, on two forms dated February 2008 and May 2008.  (R. 481-82).  Those documents provide no explanation for the diagnosis or any description of the degree to which Plaintiff's purported depression impairs her ability to perform basic work.  Thus, at best, those documents prove only that Plaintiff has depression but not that it limits her ability to perform basic work.  The ALJ cannot speculate about the impact of a purported condition on a claimant's functionality.  The claimant bears the burden of proving that the condition limits her ability to perform basic work.  Plaintiff has not satisfied that burden.

Finally, the ALJ considered the cumulative effect of all of Plaintiff's health issues during his analysis of Plaintiff's RFC.  The ALJ relied on the doctor's overall assessment of Plaintiff's functionality and her testimony regarding her symptoms and mobility.  The ALJ focused on Plaintiff's actual functionality in light of all her claimed conditions and determined that Plaintiff could perform past relevant work.  Thus, the ALJ did not ignore the possibility that Plaintiff's alleged conditions may limit her ability to work when considered together rather than in isolation.

### C.  Whether there is Substantial Evidence to Support the ALJ's Conclusions Regarding Plaintiff's RFC and Past Relevant Work (Step Four and Five)

At step four, the Commissioner determines whether, despite a claimant's severe impairments, the claimant retains the RFC to perform her past relevant work.  Salles v. Comm'r

of Soc. Sec., 229 F. App'x. 140, 147 (3d Cir. 2007) (citing 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f)).  "The RFC reflects 'what [the claimant] can still do despite [her] limitations.'" Id. (quoting 20 C.F.R. § 416.945(a)).  "In making a [RFC] determination, the ALJ must consider all evidence before him."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000). The ALJ must also "consider the combined effect of all . . . impairments without regard to whether such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  Once the ALJ determines a claimant's RFC, the ALJ must evaluate whether the claimant retains the capacity to perform past relevant work.  Chiaradio v. Comm'r of Soc. Sec., No. 10-3605, 2011 U.S. App. LEXIS 8586, at *5 (3d Cir. Apr. 26, 2011).  The claimant bears the burden of proving "that she lacks sufficient RFC to perform her past relevant work."  Salles, 229 F. App'x. at 147.  If she fails to satisfy that burden, the ALJ must deny her benefits.  See 20 C.F.R. § 416.920(e).

The Administration has further explained that a claimant's RFC is determined by identifying a claimant's functional limitations or restrictions and assessing the claimant's work-related abilities on a function-by-function basis.  See 20 C.F.R. 404.1545(b)-(d); SSR 96-8p, 1996 SSR LEXIS 5.  "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 SSR LEXIS 5, at *1.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  Id. at 5.  An individual's "RFC is not the least an individual can do despite his or her limitations or restrictions, but the most."  Id.

"To determine the physical exertion requirements of work in the national economy, [the Administration] classifies jobs as sedentary, light, medium, heavy, and very heavy."  20 C.F.R.

404.1567 (DBI); 20 C.FR. 416.967 (SSI).  The Administration applies the following relevant

definitions:

>           (a) Sedentary work. Sedentary work involves lifting no more than
>           10 pounds at a time and occasionally lifting or carrying articles
>           like docket files, ledgers, and small tools. Although a sedentary job
>           is defined as one which involves sitting, a certain amount of
>           walking and standing is often necessary in carrying out job duties.
>           Jobs are sedentary if walking and standing are required
>           occasionally and other sedentary criteria are met.
>
>           (b) Light work. Light work involves lifting no more than 20
>           pounds at a time with frequent lifting or carrying of objects
>           weighing up to 10 pounds. Even though the weight lifted may be
>           very little, a job is in this category when it requires a good deal of
>           walking or standing, or when it involves sitting most of the time
>           with some pushing and pulling of arm or leg controls. To be
>           considered capable of performing a full or wide  range of light
>           work, you must have the ability to do substantially all of these
>           activities.  If someone can do light work, we determine that he or
>           she can also do sedentary work, unless there are additional limiting
>           factors such as loss of fine dexterity or inability to sit for long
>           periods of time.

20 C.F.R. 404.1567(a)-(b) (DBI); 20 C.FR. 416.967(a)-(b) (SSI).

        The ALJ determined that Plaintiff is able to perform "light work," and, consequently,

Plaintiff could continue to perform her past relevant work as a cashier or a replications operator.

Plaintiff argues that the ALJ's opinion "does not even remotely satisfy the requirements imposed

upon the Commissioner and fails in virtually every respect to comply with the Agency's own

pronouncements as contained in SSR 96-8p."  (Pl.'s Br. at 18).  The Court disagrees.  The ALJ

properly considered all relevant evidence, provided a sound basis for determining that Plaintiff's

alleged limitations are incredible, and properly concluded that Plaintiff can perform light work

including her past work as a cashier and replications operator.

        First, Plaintiff is incorrect that the ALJ did not conduct a function-by-function analysis of

Plaintiff's RFC.  After considering all the evidence, the ALJ specifically found that Plaintiff

> is able to lift/carry ten pounds frequently and twenty pounds
> occasionally; can stand and/or walk for six hours in an eight hour
> workday; is able to sit for six hours in an eight hour workday; must
> periodically alternate sitting and standing to relieve pain and
> discomfort; has no manipulative or environmental limitations; can
> frequently push and/or pull with the upper and lower extremities;
> and can occasionally climb ramps and stairs, balance, stoop, kneel,
> crouch and crawl, but can never climb ladders, ropes, and
> scaffolds.

(R. 18, 27).  In reaching those determinations, the ALJ conducted almost ten pages of extensive analysis and discussion regarding the available evidence, including Plaintiff's testimony and medical evidence.  The ALJ's thorough review and specific determinations satisfy the methodology required by SSR 96-8p.  See Salles, 229 F. App'x. at 149 (upholding an ALJ's function-by-function analysis).

Second, Plaintiff argues that the ALJ failed to consider the effect of her mental condition on her RFC.  However, as noted above, Plaintiff did not claim that she suffered from a mental limitation when she appeared before the ALJ.  Additionally, the record includes only two unexplained notations in documents by Plaintiff's treating physician that Plaintiff experiences depression.  The record does not include any evidence regarding the actual effect of Plaintiff's alleged depression on her functionality.  Thus, even if the ALJ should have considered Plaintiff's mental capacity, there is insufficient evidence to support a conclusion that Plaintiff's alleged depression has an impact on her functionality.

Third, the ALJ properly analyzed the evidence, and his determination is supported by both Plaintiff's testimony and the medical evidence.  The ALJ determined that Plaintiff's alleged limitations were not as severe as she claimed because her testimony was not "fully credible."  (R. 24).  The Court addresses the propriety of that conclusion below.  Regarding the medical evidence, the ALJ's decision is supported by substantial evidence.  Dr. Bojarski, who evaluated

24

and treated Plaintiff more than six times between December 2005 and May 2006, found that Plaintiff could return to work "in a light duty, sit down job." (R. 303). He also found that Plaintiff did not suffer from any significant mobility restrictions. Dr. Sackstein, who examined and treated Plaintiff between June 2006 and October 2006, found that Plaintiff had full strength in her lower extremities, but suffered from lumbar radiculopathy and possible cervical radiculopathy. (R. 414-27). Dr. Sackstein did not make any findings regarding Plaintiff's ability to work. However, Dr. Sackstein did find that Plaintiff had "no acute distress" and that she had full range of motion. (R. 428). Dr. O'Shea found that Plaintiff could work "light duty with frequent standing or sitting." (R. 435). However, in 2007, Dr. Bustos determined that Dr. O'Shea's restrictions were not supported by the objective medical evidence and that Plaintiff could sit for six hours in an eight-hour day. (R. 437). Also in 2007, Dr. Gallagher, who examined and treated Plaintiff, determined that Plaintiff was "an overweight female with no acute distress." (R. 461). Dr. Knod and Dr. Peacock generally confirmed that Plaintiff did not have any significant limitations on her mobility and that she retained significant range of motion. Thus, the evidence that directly supports Plaintiff's claim that she was unable to perform light work of any kind is the notation by Dr. Luma that Plaintiff is "unable to lift anything at this time." (R. 493). However, Dr. Luma did not explain the objective basis for his conclusion. More importantly, the ALJ expressly considered Dr. Luma's notations but rejected them, stating "there is a lack of objective clinical or laboratory findings to support the degree of limitation alleged." (R. 23). The ALJ properly concluded that the objective medical evidence supported the conclusion that Plaintiff was able to perform light work. That conclusion is supported by substantial evidence.

Fourth, regarding step five, after determining that Plaintiff remains able to perform light work, the ALJ properly determined that Plaintiff could perform past relevant work.  (R. 25-26).  Based on Plaintiff's testimony and other statements and the U.S. Department of Labor Dictionary of Occupational Titles and Selected Characteristics manuals, the ALJ found that Plaintiff's position as a cashier required her to perform "semi-skilled, light work."  (R. 26).  Based on Plaintiff's testimony and a job description by Sony, the ALJ determined that Plaintiff's position as a replications operator involved "lifting in the sedentary exertional level, but requires the claimant to walk and stand at the light exertional level."  (R. 26).  Plaintiff does not challenge those determinations.  In view of the ALJ's RFC determination, the ALJ properly concluded that Plaintiff could perform the duties of her past relevant work, and therefore does not qualify as "disabled" under 20 C.F.R. § 404.1505 or 20 C.F.R. § 416.905.  (R. 26).

### D.  Whether the ALJ Adequately Considered Plaintiff's Self-Reported Pain and Limitations

Plaintiff argues that the ALJ improperly discredited her testimony regarding her pain physical limitations.  Specifically, Plaintiff claims that the ALJ improperly disregarded her subjective complaints of disabling pain.  (Pl.'s Br. at 19-20).  The ALJ provided two grounds for rejecting the alleged severity of Plaintiff's limitations.  First, the ALJ determined that Plaintiff's testimony was incredible because it was inconsistent with her documented reports to various physicians.  Second, the ALJ concluded that Plaintiff's alleged pain was unsupported by her diagnoses as stated in the objective medical evidence.

"Allegations of pain and other subjective symptoms must be supported by objective medical evidence."  Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529).  The ALJ must first conclude from objective medical evidence that the claimant suffers from "a medical impairment that could reasonably cause the alleged symptoms."  Id.  Next, the ALJ "must

evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Id. If the claimant alleges "a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ must "carefully consider any other information . . . about [claimant's] symptoms." 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c). The ALJ may consider evidence, including the claimant's testimony, regarding facts such as: (1) the claimant's daily activities; (2) the "location, duration, frequency, and intensity of" the claimant's pain or other symptoms; (3) "precipitating and aggravating" factors (4) any medication the claimant took to alleviate the symptoms; (5) other treatments received by the claimant; (6) any measures the claimant took to alleviate the symptoms; and (7) other facts concerning the claimant's "functional limitations and restrictions due to pain." 20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

The process of evaluating "other evidence" of pain and disabling symptoms "obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)); see Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). "[T]he ALJ need only include in the RFC those limitations which he finds to be credible." Salles, 229 F. App'x. at 147 (citing Burnett, 220 F.3d at 121). If an ALJ determines that a claimant's alleged limitations are "less than credible," the ALJ may "properly exclude them from the RFC." Id. (citing Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002)). However, if an ALJ rejects a claimant's testimony regarding symptoms, he must "specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

Here, the ALJ conducted an extensive analysis of Plaintiff's testimony regarding her symptoms.  The ALJ considered Plaintiff's testimony regarding her pain, her mobility, her medication, and her ability to perform basic daily tasks.  (R. 15-18, 24).  However, the ALJ determined that Plaintiff's testimony regarding her symptoms was incredible because:  (1) some of her testimony regarding her pain and functionality contradicted her reports to treating physicians, (R. 24); (2) some of her testimony regarding medical conditions and symptoms was conspicuously unsubstantiated by any documentary evidence, (R. 24); (3) her alleged rate of deterioration is inconsistent with her ability to perform daily activities, (R. 24); and (4) her claimed limitations are disproportionate to the diagnoses substantiated by the objective medical evidence, (R. 25).  The ALJ properly explained his basis for discrediting Plaintiff's testimony regarding her symptoms and properly excluded it from his analysis of her limitations.  The ALJ's analysis is thorough, supported by medical evidence in the record, and entitled to deference.

### E.  Whether the ALJ Properly Considered All of the Medical Evidence

Plaintiff claims that the ALJ improperly discredited evidence from four treating physicians.  Specifically Plaintiff asserts that the ALJ improperly discredited the following physician opinions:  (1) in May 2008, Dr. Heppenstall found that Plaintiff was unable to work, (R. 478); (2) in January 2007, Dr. O'Shea concluded that Plaintiff could sit or stand for only thirty minutes at a time, (R. 431); (3) in November 2006, Dr. Taffet asserted that Plaintiff was "[d]isabled," (R. 457); and (4) in October 2008, Dr. Luma asserted that Plaintiff was "unable to lift anything," (R. 493).

The ALJ should give a treating physician's opinion "controlling weight" if it is "well supported" by "medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantive evidence in the case record."  20 C.F.R. § 404.1527(d)(2); 20

C.F.R. § 416.927(d)(2); see Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).  However, only "medical opinions" are entitled to deference by the ALJ.  See Schwartz v. Halter, 134 F. Supp. 2d 640, 650 (E.D. Pa. 2001).  "Opinions on issues reserved to the Commissioner, such as an opinion that the claimant is disabled, are not medical opinions, however, and thus are not entitled to controlling weight."  Id. (citing 20 C.F.R. § 404.1527(e)).

If the "opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Id. at 651 (quoting Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993))).  An ALJ may reject a treating physician's opinion "'only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."  Id. (quoting Plummer, 186 F.3d at 429).  "[T]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Comm's Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

The ALJ properly analyzed the medical evidence in the record and clearly explained his basis for rejecting certain opinions by some of Plaintiff's treating physicians.  First, the ALJ properly disposed of the opinions of Dr. Taffet and Dr. Heppenstall as conclusory non-medical opinions.  (R. 22-23).  Dr. Taffet simply states that Plaintiff is under his care and that she is "disabled."  Only the Commissioner can determine, based on objective medical evidence, whether Plaintiff is disabled.  The ALJ was not required to defer to Dr. Taffet's conclusory nonmedical assertion.  The ALJ discussed Dr. Taffet's opinion and explained that he rejected the opinion because it was conclusory and unsupported by any objective medical evidence.  (R. 23).  Dr. Heppenstall similarly asserted that Plaintiff was unable to work.  The ALJ reviewed Dr. Heppenstall's opinion and rejected it because the assertion that Plaintiff was unable to work was

not supported by Dr. Heppenstall's own clinical findings after examining Plaintiff.  (R. 23).  The ALJ properly and thoroughly explained its reasons for rejecting Dr. Heppenstall and Dr. Taffet's opinions regarding Plaintiff's inability to work.

The ALJ also explained its reasons for rejecting Dr. Luma's opinion that Plaintiff cannot lift anything.  Dr. Luma asserts in conclusory terms that Plaintiff is "unable to lift anything at this time."  (R. 493).  Dr. Luma does not explain the medical basis for the limitation.  The ALJ therefore rejected Dr. Luma's opinion because "there is a lack of objective clinical laboratory findings to support the degree of limitation alleged."  (R. 23).  Regarding Dr. O'Shea, the ALJ rejected only Dr. O'Shea's January 17, 2007 conclusion that Plaintiff was required to alternate between sitting and standing every thirty minutes because it was not supported by the objective medical evidence.  (R. 431).  The ALJ accepted Dr. O'Shea's earlier conclusion that Plaintiff was able to perform "light duty with no lifting greater than 25 pounds."  (R. 435).  The ALJ's treatment of Dr. O'Shea's opinions is supported by the record.  Dr. Bustos explicitly rejected Dr. O'Shea's finding that Plaintiff must alternate between sitting and standing every thirty minutes and concluded that Plaintiff could sit for six hours during an eight-hour shift.  Thus, the ALJ's rejection of Dr. O'Shea's finding was not based on speculation or lay opinion.

Moreover, the record contains substantial objective medical evidence supporting the ALJ's conclusion that Plaintiff is able to perform light work.  For example, Dr. Bojarski, a treating physician, examined Plaintiff at least seven times between December 2005 and May 2006.  Dr. Bojarski repeatedly concluded that Plaintiff was able to work.  Similarly, Dr. Peacock, who was also a treating physician, examined Plaintiff and found that Plaintiff's back problems caused only a ten percent partial disability in her spine.  (R. 505).  Dr. Bustos, a state agency consultant, examined Plaintiff's records and concluded that she was able to perform light

work.[4]  The ALJ properly evaluated the entirety of the objective medical evidence, provided a

thorough explanation of the evidence that he accepted and the evidence that he rejected, and

reached a conclusion that is supported by substantial evidence on the record.

## IV.    CONCLUSION

For the reasons discussed above, the Court upholds the ALJ's denial of SSI and DBI and

denies Plaintiff's appeal.  An appropriate Order shall enter.


Dated: 6/24/2011                                          /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge

---

[4] State agency consultants are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1537(f)(2)(i); 20 C.F.R. § 416.927(f)(2)(i).

31